## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

Yves Jean Louis
DOB         ; POB:              

I, William Clauss being duly sworn, hereby depose and state:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI"). assigned to the Miami Division. I have been so employed since August, 2003. In that capacity I investigate criminal violations of the Federal laws of the United States, including international kidnaping and homicides. Before working for the FBI, I was employed by the Drug Enforcement Administration and served in the United States military.

2. Since December 2004, I have been assigned to investigate the abduction and hostage-taking of United States citizens taking place in the Caribbean and Latin America. As such, I was assigned to the investigation of a kidnaping and hostage-taking of a nine-year-old American girl [hereinafter "the child"] perpetrated by a group of four individuals in Haiti between on or about September 26, 2005 and on or about October 4, 2005.

3. This Affidavit contains information in support of a criminal complaint, charging 1) YVES JEAN LOUIS ; 2) ERNSO LOUIS with hostage-taking, in violation of 18 United States Code Section 1203. Two other individuals, S3 and S4 also participated in the hostage taking.

4. The facts and information contained in this Affidavit are based on my personal knowledge, as well as my discussions with other members of the investigative team, and the observations of other agents and officers involved in this investigation.

5. This Affidavit contains information necessary to support probable cause, and is not intended to include each and every fact and matter observed by me or known to the government.

1

6. The evidence developed in the case through interviews of child victim, eyewitnesses and cooperating coconspirators shows that **Yves Jean Louis**, **Ernso Louis**, S3 and S4, acted together to invade the home of the child, kidnap her, and hold her for ransom from on or about September 26, 2005 to on or about October 4, 2005, when she was rescued. A summary, though not exhaustive, of the investigation to date indicates that:

7. On or about September 26, 2005, at approximately 2 a.m., the hostage-takers invaded the home of the child. The child was asleep in the home she occupied with her parents in the Route des Freres section of Port au Prince, Haiti. The child is a nine-year-old girl and is a citizen of the United States. having been born in Boston, Massachusetts in 1995.

8. The hostage-takers had advance knowledge of the layout of the house from **Yves Jean Louis**, who by virtue of his past employment by the family of the child, was able to convey detailed information to the three other hostage-takers concerning the physical layout of the house. **Yves Jean Louis**, who was also a distant relative of the mother of the child, was angry at the family of the child. **Yves Jean Louis** believed that they had underpaid him in his employment and that they had promised him other financial rewards and then declined to provide him with further funds or items of value, thus providing a motive for the hostage-taking. S3 had also been employed by the child's family at some point.

9. Upon entry on the property, **Yves Jean Louis** distracted the dogs on the property by giving them food. While **Yves Jean Louis** was keeping the dogs occupied, **Ernso Louis**, S3 and S4 entered the home by smashing a door with the machete. Having fed the dogs, **Yves Jean Louis** rejoined the other three in the house. The group proceeded to the bedroom of the parents of the child. Once in the bedroom, **Yves Jean Louis**, **Ernso Louis** and S3 bound the father to prevent him

from moving. S4 pointed a fake gun at the father of the child. The mother was bound as well. They stole approximately one thousand US dollars in local currency, a watch and a pair of athletic shoes. The hostage-takers went to the room where the child was sleeping. They covered the mouth of the child, picked her up and carried her out of the house, without waking any of the siblings. They threatened the child during the abduction that they would kill her if she did not stay quiet. They also pointed the fake gun at the child's head to threaten her.

10. **Yves Jean Louis** stole the child's father's car and drove it away as the getaway car. All four of the hostage-takers then took the child to a location and held her there until approximately 10 p.m. that night. The structure at this location was a shack that had little protection from the elements. For that reason, the hostage-takers decided to move the child to another location.

11. The hostage-takers proceeded to make ransom demands of the child's family by telephone. The initial demand was $200,000 in U.S. currency, a demand made by **Ernso Louis**. Over the course of the negotiations, which occurred by telephone, the demand amount was eventually lowered to $50,000. S3 took the lead role for the captors in the negotiations. The family tried to raise money but could come up with only an amount of approximately $8,000. The child's captors found $8,000 unacceptable and continued to hold the child against her will.

12. At least two of the hostage-takers, **Ernso Louis** and S3, next moved the child to a mountainous remote location, accessible only hiking on foot for approximately two hours, in the Ghantier area of Haiti. They held the child hostage on the third floor of a building there. **Ernso Louis** held the child there and cared for her. S3 returned as needed to that location to put the child on the phone to show proof of life during the ransom negotiations. The hostage-takers repeatedly told the child that if she made too much noise, tried to leave, or told anyone that she had been

kidnaped, she and her family would be killed. After a number of days, **Ernso Louis** decided to permit the child to go outside to play with some other children who lived in the nearby area.

13. An individual who resided in the area noticed the arrival of the new child and befriended her. That individual engaged the child in conversation and established a level of trust with her. That individual eventually learned from the child that she had been kidnaped. That individual persuaded the child to write in charcoal on a piece of paper the name of her father and her telephone number.

14. The individual went to the local authorities with this information. Because of the situation, it was decided that the best approach was for that individual to return to the scene and arrange a way for the child to go outside, which the individual did. The individual entered the house and engaged **Ernso Louis** in conversation to distract him until an opportunity arose to signal the child to go outside. When the individual signaled her, the child bolted. Outside, law enforcement, including the Haitian National Police ("HNP") and the United Nations Civil Police ("UN CivPol"), was waiting. A short while later, law enforcement entered the three-story building where the child had been held hostage. They found **Ernso Louis** inside and detained him.

15. Agents of the FBI spoke with the child, as well as members of her family. The child informed them that she knew the identity of one of her kidnappers. The child related that, although she had been blindfolded for much of the ordeal, she clearly recognized the voice of **Yves Jean Louis**. The child was familiar with his voice from having heard it when he worked at her family's home. The family of the child provided some identifying data and law enforcement was able to determine where **Yves Jean Louis** was.

16. **Yves Jean Louis** was apprehended by law enforcement at his home. The FBI interviewed **Yves Jean Louis**. At the start of the interview, the FBI informed **Yves Jean Louis** of

4

his rights in his native language. **Yves Jean Louis** proceeded to waive his rights orally and in writing. **Yves Jean Louis** gave a statement confessing to his participation in the kidnaping and hostage-taking. **Yves Jean Louis** also implicated his coconspirators, **Ernso Louis**, S3 and S4.

17. The FBI interviewed also **Ernso Louis**. At the start of the interview, the FBI informed **Ernso Louis** of his rights in his native language. **Ernso Louis** proceeded to waive his rights orally and in writing. **Ernso Louis** gave a statement confessing to his participation in the kidnaping and hostage-taking. **Ernso Louis** also implicated his coconspirators, **Yves Jean Louis**, S3 and S4.

18. **Ernso Louis** was found in possession of the athletic shoes as well as a binder and a wallet belonging to the child's father, all of which had been stolen from the child's house the night of the kidnaping.

19. As of this date, S3 and S4 remain at large.

20. **Yves Jean Louis** was positively identified by the child after reviewing a stack of 9 photographs. Upon observing a photograph of **Yves Jean Louis,** the child identified him by name as a member of the group that kidnaped her and held her hostage.

21. **Ernso Louis** was positively identified by the child after reviewing a stack of 9 photographs. Upon observing a photograph of **Ernso Louis,** the child identified him by the name of "McKinley" as a member of the group that kidnaped her and held her hostage.

22. Thus, I have probable cause to believe that **Yves Jean Louis**, and **Ernso Louis** committed the offense of hostage-taking, in violation of 18 United States Code Section 1203.

23. All events alleged in this affidavit took place within the Republic of Haiti, and the extraterritorial jurisdiction of the United States, and, pursuant to Title 18, United States Code, Section 3238, within the venue of the United States District Court for the District of Columbia.

_____
William Clauss, Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this _____ day of _____ 2005.
OCT 07 2005

_____
United States Magistrate Judge
DEBORAH A. ROBINSON
U.S. MAGISTRATE JUDGE